IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| STEPHEN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11-cv-04058-SLD-JEH |
| | ) | |
| CITY OF ROCK ISLAND, ILLINOIS, | ) | |
| a Municipal Corporation, and Rock | ) | |
| Island Police Officers KRIS KUHLMAN, | ) | |
| JONATHAN CARY, MICHAEL CRONE, | ) | |
| and DOUG ELLIOTT, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Stephen Johnson claims Defendant Rock Island Police Officers threatened him with arrest based on his public preaching in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as the Speech and Religion Clauses of the Illinois Constitution.  In an eight-count Complaint, Johnson sues the Officers and the City of Rock Island seeking injunctive, declaratory, and monetary relief.  Second Am. Compl., ECF No. 75.  Defendants have moved for summary judgment on several grounds.  Defs.' Mot. Summ. J., ECF No. 78.

Plaintiff's Motion to Supplement his Response to Motion for Summary Judgment, ECF No. 86, is GRANTED.  Plaintiff's Motion to Consider the Evidence Tendered in Open Court, ECF No. 87, is MOOT because, as the motion acknowledges, a copy of the recording at issue was already admitted into evidence in the hearing of March 5, 2013.  Plaintiff's Motion to Strike Reply to Response to Motion for Summary Judgment, ECF No. 88, is DENIED because

Defendants do not dispute the admissibility of the recording of the April 26, 2012 conversation tendered in the March 5, 2013 hearing, *see* Defs.' Resp. Opp. Mot. Strike 2, ECF No. 90; further, the portions of Defendants' Reply that Plaintiff seeks to strike are independently supported by references to the factual record. For the following reasons, Defendants' Motion for Summary Judgment, ECF No. 78, is GRANTED.

## BACKGROUND

Johnson, a Colorado resident, has preached the Christian message on street corners around the country. Oct. 28, 2011 Hr'g Tr. 5:1–6:7. Johnson is a former Moline, Illinois resident and still has grandchildren living in the area whom he occasionally visits. *Id.* On at least three occasions since 2011, Johnson preached and distributed religious literature in downtown Rock Island. This case arises out of the first two of those episodes.

### I. June 11, 2011

On the afternoon of June 11, 2011, Johnson preached his Christian message and distributed literature on the corner of 2nd Avenue and 17th Street in the commercial district of downtown Rock Island. *Id.* 7:23–9:8. He began prior to the start of the Gumbo Ya Ya festival, which was held there later that afternoon. He stood atop a bench next to a short retaining wall or planter at the corner. *Id.* 23:13–24:3. As a result of his positioning, Johnson claims he did not obstruct the sidewalk and was completely out of the flow of pedestrian traffic. *Id.* 25:9–25. He does not recall seeing any pedestrians enter or cross 17th Street to avoid passing him on the sidewalk. *Id.* 57:21–23.

Johnson said he only encountered a "few" people during his preaching that day. *Id.* 13:16. He said he spoke in a projected voice—as loud as his speaking voice could go without

shouting or screaming, *id.* 68:23–69:2, and without bullhorn or other amplification—for about 15 to 20 minutes, reading from the Bible, explaining its message, and handing out Gospel tracts and Bibles, and then spoke briefly with some passersby. *Id.* 14:11–15:10. His message includes a warning that "the wages of sin is death and Hell" and that "God is a God of justice and that people will end up in Hell if you do not repent." *Id.* 19:20–20:2. According to Johnson, he did not "engage" with these passersby too extensively; some told him that he should stop and leave, and others encouraged and thanked him for preaching there. *Id.* 14:25–15:18. He saw approximately 20 people, he estimates, and the positive responses came from about five people, with the negative from about five other people. *Id.* 69:22–70:19.

After 30 to 45 minutes, Johnson said he rested, sitting on the retaining wall, reading the Bible, and waiting to see if anyone would approach him. *Id.* 20:17–24. While he was sitting there, Rock Island Police Ofc. Jonathan Cary drove up on 17th Street and stopped near Johnson. *Id.* 26:7–13. From the driver's seat of the car, Johnson claims Officer Cary motioned with his finger that Johnson should approach. Johnson walked over and spoke with him through the open passenger-side window. *Id.* 26:19–27:5. While they spoke, Officer Kris Kulhman arrived in a separate vehicle, parked, exited, and came to stand behind Johnson, according to Johnson. *Id.* 27:6–11.

According to Johnson's testimony, the conversation proceeded as follows: Officer Cary asked him what he was doing, and Johnson said he was preaching. Officer Cary asked Johnson to explain his activity in greater detail, and Johnson did. *Id.* 27:14–18. Officer Cary asked at one point if Johnson ever used the term, "Hell," and Johnson said he did. *Id.* 31:3–7. Officer Cary said, "Well, you cannot do that here." *Id.* 27:20–21. Johnson asked what he was doing that was

impermissible; he says he repeatedly questioned Officer Cary as to what specific activities he would have to engage in to violate the law at issue, the Illinois Disorderly Conduct Statute, 720 ILCS 5/26-1. Officer Cary said Johnson (1) could not raise his voice, (2) could not "offend" anyone, and (3) could not "say anything that would disturb anybody in any way." *Id.* 27:22–29:20. Johnson pressed Officer Cary on what "disturb" meant, and Officer Cary said the term came from the city ordinance at issue,[1] which Johnson could look up online. *Id.* 29:23–31:18. Johnson told Officer Cary that he intended to return to preach in Rock Island, and Officer Cary responded, "If you get up there and do that again, you will be arrested." *Id.* 32:15–20. The Officers never told Johnson to leave, *id.* 30:8–13, and when Johnson told Officer Cary that he would leave, Officer Cary said Johnson could stay and hand out literature but "just can't say anything." *Id.* 33:1–9.

According to the Officers, the encounter transpired in this way: Officer Cary was dispatched to the 2nd Avenue and 17th Street intersection around 4:45 p.m. in response to a report of a "disturbance," and found Johnson sitting silently on a planter there. *Id.* 91:1–93:14; 94:4–6. At the hearing, Officer Cary could not recall the content of the "very casual" complaint call the Department received and did not remember what, if any, description he received of the conduct at issue. Officer Cary said it is his job to respond to calls even if they provide "minimal information," and he went to the site that day "basically to do some information-gathering, fact-finding." 102:11–24. From the driver's seat of his car, Officer Cary told Johnson through the open passenger-side window that he was responding to a "disturbance" call and asked Johnson

---

[1] Officer Cary claims he did not say "ordinance" because he was referring to the Disorderly Conduct Statute. The Court previously found that Officer Cary was describing the statute and not Rock Island Ordinance 10-21 in answering Johnson's questions. Sept. 28, 2012 Order 8, ECF No. 41.

what he was doing, to which Johnson responded that he was "passing out tracts and preaching."

*Id.* 94:4–10. Officer Cary told Johnson he could preach all he wanted, but also gave him some

"guidelines:"

> You can't prohibit people from passing. If they don't want to talk to you, they don't have
> to. You can't make them stay where they're at. I said, if they want to walk past you, you
> can't get in their way. I said, you can't get in their face and yell and scream to the point
> that it would alarm or disturb them. . . . I said, you can talk to people all you want. You
> can preach. You can hand out whatever you want. I said, just you can't alarm or disturb
> people to the point that they would be, you know, frightened.

*Id.* 94:23–95:7, 96:21–24. Cary said Johnson then asked him questions about what he could not

legally do, and balked at Cary's advice—"he was offended that we would legislate him yelling

and screaming in people's faces to the point where it would alarm and disturb them." *Id.*

95:10–20, 109:14–20. Johnson also said that "he should be able to wave his fist in people's faces

and tell them that he's going to batter them and that is freedom of speech."[2] Cary said he was

describing the Illinois disorderly conduct and arrest statutes in responding to Johnson's

questions. *Id.* 98:18–99:6.

According to Officer Cary, he merely told Johnson what he could not lawfully do; he

never said Johnson "had been doing that or anything of that nature." *Id.* 98:21–24. Regarding

any threat of arrest, "I told him he could be arrested if he alarmed or disturbed somebody. For

that. Not for any actions he did prior to us arriving there." *Id.* 109:21–25. In response to

Johnson's questioning, Officer Cary said he could not exhaustively explain every instance that

would constitute "alarming and disturbing" conduct and that the standard was whether the

---

[2] Johnson denies ever asserting a right to wave his fist or yell and scream at people. *Id.* 114:4–7. Johnson said he
sometimes gestures in the air with his Bible as he speaks, but not if anyone is walking within 10 or 15 feet, and no
one has ever appeared apprehensive when he so gestured. *Id.* 115:14–116:5.

conduct was "reasonable." *Id.* 110:1–14. They did not discuss the content of Johnson's message at all. *Id.* 104:2–5. Officer Cary never told Johnson he could not speak with people or pass out materials, and did not place him under arrest. *See id.* 96:14–97:12. Officer Cary did not at any point witness Johnson actually engaged in preaching or obstructing pedestrian traffic. *Id.* 99:16–20.

Officer Kuhlman arrived separately, in his own squad car, after Cary and Johnson's conversation had begun. Officer Kuhlman parked his car and came to stand, according to Officer Cary, next to and a little behind his passenger door. *Id.* 97:18–98:8. Johnson claims that this placed Officer Kuhlman behind his back as he spoke to Cary. Johnson said Officer Kuhlman appeared "very tight lipped" and "very angry, very flushed." *Id.* 35:21–36:1. "I felt very intimidated and threatened by him," Johnson said. *Id.* 36:15–16. Despite his presence, there is no evidence that Kuhlman said anything. *See id.* 61:21–62:25. When the conversation began, Johnson testified, he was unsure whether he would resume preaching that day, but the encounter made him feel that the option to continue was taken away. *Id.* 71:24–72:12. He left the district immediately after the conversation ended. *Id.* 97:13–14.

Carl McClaskey, special events coordinator for the Downtown Rock Island Arts and Entertainment District, was working at the Gumbo Ya Ya festival that day. *Id.* 77:6–78:10. He recalls being called to the festival gate, near the 17th Street and 2nd Avenue intersection, around 4:30 or 4:45 p.m. to respond to "some sort of disturbance." *Id.* 81:9–23. From his location inside the festival gate, McClaskey said the disturbance was "a gentleman kind of waving his arm, holding a book" and speaking in a loud voice. *Id.* 82:6–14. McClaskey said he noticed that some people walking toward the gate were jaywalking in a path that avoided Johnson. *Id.*

83:1–5.  However, McClaskey said he saw Johnson standing next to a planter set four to five feet back from sidewalk, and did not see Johnson block the sidewalk or otherwise obstruct pedestrian traffic.  *Id.* 86:8–12; 87:6–13.

At the October 28, 2011 hearing, Johnson testified that he wanted to preach again in Rock Island, came to the area "every month or so," and would preach every time he came if he knew he could not be arrested for it.  *Id.* 37:3–25.  Johnson said he returned to Rock Island "almost every month" between the June encounter and the October hearing, and did not preach on any occasion. *Id.* 67:3–10.  When specifically asked whether he feared arrest if he preached again, Johnson's reply was, "I was told that if I did this again, I would be arrested."

Johnson filed his initial complaint on August 1, 2011.  He named the City of Rock Island as sole defendant and sought damages, a declaration that Ordinance 10-21 was unconstitutional as applied to his preaching, and a temporary restraining order and preliminary injunction preventing the City from enforcing the Ordinance against him.  Compl. 12–13, ECF No. 1. Following the October 28, 2011 hearing on Johnson's preliminary injunctive relief requests, Johnson amended his claims to encompass the Officers' alleged application of the Illinois Disorderly Conduct Statute.  *See* Pl.'s Supp. Am. Mot. Pre. Inj., ECF No. 16-1.

**II. April 26, 2012**

Before a decision was rendered on his requests for prospective relief, Johnson preached at the corner of 18th Street and 2nd Avenue in downtown Rock Island around midday on April 26, 2012.  Mar. 5, 2013 Hr'g Tr. 14:23–15:8.  According to Johnson's testimony at an April 26, 2012 hearing, he proclaimed the Christian message for about 15 minutes from the sidewalk in a raised voice, addressing whomever happened to be on the street.  *Id.* 15:10–17, 37:3–4.  Most people

were across the street from him, at a distance of maybe 100 or 120 feet, he estimates, with some in line to buy lunch from a food cart. *Id.* 18:8–21, 27:5–11. As before, Johnson said his preaching incorporated the word, "Hell," in the context of Biblical language and his message that "everyone dies once and they face judgment." *Id.* 19:1–20:1. He testified that he has never threatened to cause death or bodily harm to any person in his audience. *Id.* 20:15–20. He then walked back toward his car, which was parked half a block away on 18th Street. *Id.* 15:10–21. After climbing in and preparing to drive off, Johnson said, he was approached by two police cars with their lights on. He said police—initially only two officers, he thought, joined by a third later—asked him to get out of his car, and a conversation ensued. *Id.* 15:22–16:5.

According to Officer Michael Crone, he was dispatched to the corner of 18th Street and 2nd Avenue in downtown Rock Island on April 26, 2012, in response to a complaint of a disturbance. Crone Dep. 5:17–20, ECF No. 79-5. Specifically, in Officer Crone's words, the complaint was that "[t]here was a subject in the District, cursing at people and telling them that they are going to die, and had a Bible in their hand." *Id.* 13:20–23. As Officer Crone was driving northbound on 18th Street, Officer Will Anderson pointed at Johnson on the side of the road and identified him as the subject. *Id.* 6:21–7:24. In response, Officer Crone turned on his lights, did a U-turn, and pulled up behind the pickup truck Johnson was climbing into. *Id.* 8:4–7. Johnson got out and approached Officer Crone and started the conversation. *Id.* 8:11–15. Officer Crone never saw Johnson preach and never spoke with the person who made the complaint. *Id.* 12:8–20.

Officer Douglas Elliott recalls being dispatched to 18th Street and 2nd Avenue that day along with Officer Dustin Miles to assist Officer Crone in responding to a disturbance complaint.

Elliott Dep. 5:3–10.  When they arrived, Officer Elliott said, Officer Crone was speaking with

Johnson in the street.  *Id.* 5:13–15.  Johnson said he sometimes records his preaching, so he can

examine it later, with a personal recorder attached to a small lapel microphone.  Mar. 5, 2013

Hr'g Tr. 16:19–17:3.  Johnson was recording his preaching that day, and claims he forgot to turn

the recorder off; it was on and recording when he spoke with Officers Crone and Elliott.  *Id.*

21:2–18, 29:24–30:3.

   As heard by the Court, the recorded conversation[3] proceeds, in pertinent part, as follows:

   Johnson greets Officer Crone, who asks, "Are you causing a disturbance down here?

[Johnson: "No."] Yelling, cussing, cursing, carrying your Bible around?"  Johnson: "I am

carrying my Bible; I would never curse."  Officer Crone asks Johnson for identification, which he

produces.  Officer Crone: "Are you angry at somebody, or what?"  Johnson: "I'm not angry."

Officer Crone asks what Johnson was doing; he responds, "Preaching the Gospel."  Officer

Crone: "You scaring people? You can't scare people.  You can't alarm and disturb people.  You

know that's against the law, don't you? [Johnson: "Is it really?"] You could go to jail for that."

Johnson: "For scaring people?"  Officer Crone: "For alarming and disturbing people, absolutely.

I guarantee you can, OK?"  Johnson asks if that includes warning people about the existence of a

real fire.

---

[3] The recording was admitted into evidence at the March 5, 2013 hearing without objection.  Mar. 5, 2013 Hr'g Tr. 22:10–16.  Defendants' initial objection to the recording's admissibility on summary judgment is moot in light of the Illinois Supreme Court's recent holding that the Illinois Eavesdropping Statute is unconstitutional.  *See* Defs.' Resp. to Mot. Strike 2, ECF No. 90; *People v. Melongo*, 6 N.E.3d 120 (Ill. 2014); *People v. Clark*, 6 N.E.3d 154 (Ill. 2014).  An unidentified police department employee prepared a transcript of the recording, which Johnson offers as evidence.  Pl.'s Resp. Mot. Summ. J., Ex. 2, ECF No. 83-2.  Defendants, however, contest the admissibility of this transcript.  Defs.' Resp. to Mot. Strike 2.  The Court need not decide this evidentiary dispute because the transcript is unnecessary: the recording has been authenticated; the pertinent portions are audible; and the statements made in the conversation it depicts have been independently corroborated by the participants' testimony.  *See* Mar. 5, 2013 Hr'g Tr. 22:1–21; Crone Dep., ECF No. 78-3; Elliott Dep., ECF No. 78-6.

A little later, Officer Crone says, "I am going to give you some advice, OK. If you come down here and you curse and you have your Bible. [Johnson: "I don't curse."] OK, this is what I am hearing from other people, OK? I'm not going to argue with you, I'm just telling you what I'm hearing. And then, if I collect one or two people as a witness, and . . . [inaudible] a couple witnesses, we can develop a case. We can arrest based off of probable cause if we have probable cause enough to believe the crime occurred. OK, and we'd get you the State's Attorney's Office, and you'd have to post bond of a thousand, five hundred, OK . . . ."

"Tell me what I am doing wrong," Johnson says, and asks for guidance on the specific law at issue. Officer Crone: "The state charge says you cannot alarm and disturb people. It's simple. I can't run . . . if I am trying to preach something— and I, I can bring a witness right now, OK—if I am trying to preach something, I can't curse and scare people, OK? If you're trying to preach a good preach, go ahead and preach all you want. But when you start alarming and disturbing people, then you break the law, am I right?"

When Johnson questions this, Officer Elliot reiterates Officer Crone's point, and adds, "You cannot alarm and disturb or provoke, provoke a breach of, uh, peace." Elliott makes a further, substantially inaudible statement about "what that means." Johnson asks rhetorically whether this is the United States. "So I can't get up on a, a public street corner, I can't do that?" Johnson asks. "You can get up there and preach all you want," Officer Elliott answers, "but you can't raise your voice." Johnson: "I can't raise my voice. Well, how am I supposed to preach if I can't raise my voice?" Officer Elliott: "You cannot raise your voice, you cannot be loud, you can't sit there and cuss, you can't sit there and tell people they're going to die. OK?" Johnson: "They're going to die." Officer Elliott: "You're preaching from the Bible. Everyone's going to

10

die." Johnson: "But it's the United States of America!" Officer Elliott says the Officers won't argue the law, adding, "This may be something that maybe you need to go to court over." At that point, Johnson informs them that he has, indeed, brought the instant suit. Officer Elliott replies, "Alright. Cool," and then, "We're done. We're done!" As Johnson continues to state that he has brought a case, the Officers both say, "Add us to it."

Johnson: "I am. I understand this, you know? I came down here, I tried to do it right, I have asked you guys, I've gone through channels, I sent a letter to the City, begging for you guys to allow me to do this, so I wouldn't have to go through channels, and I hear nonsense that I can't raise my voice. This is you guys's fault, not mine. [Officers: "No, it's your fault."] It's the United States of America! It's the United States of America!" Officer Elliott: "The United States of America's 'bout to put your ass in jail." Then, saying the conversation was over, the Officers directed Johnson to leave. Johnson returned to his car and drove away, followed at least part of the way by the Officers, he claims. Mar. 5, 2013 Hr'g Tr. 22:22–23:7.

Officer Crone testified that he told Johnson he could be arrested for "alarming and disturbing the peace." If Johnson was swearing in public, that weighs in favor of finding disorderly conduct, but it is not itself sufficient, Officer Crone said. "In my training, when they cause a disturbance, assault others, or there are other factors that lead into it, that's one of the criteria that can cause someone to be arrested." Crone Dep. 10:4–18. The alarm or disturbance necessary for disorderly conduct only happens where the actor's "physical actions are becoming assaultive," Officer Crone said. *Id.* 13:11. When discussing the law with Johnson, Officer Crone said, he had not formed any opinion as to whether Johnson met these criteria, and did not even know whether Johnson, who approached and started questioning Officer Crone, was actually the

subject of the complaint.  *Id.* 13:13–17.

Officer Crone further testified that he would not consider the message—which he maintains he did not know Johnson was preaching—that when you die, you will go to Hell, to be "alarming and disturbing."  *Id.* 15:15–19.  To the extent that, in the recorded conversation, Officer Crone could be understood to say a person could be arrested for alarming and disturbing behavior based on a religious message that incorporated swear words and could scare people, he said his aim was prophylactic in aid of Johnson.  "[T]o give the best advice I could to someone that approached me, I would tell them absolutely that, keep them—so they could preach and not have to worry about the police coming down," Officer Crone said.  *Id.* 16:19–17:16.  But a mere complaint that a person was scared by something Johnson said, without personal satisfaction that probable cause existed that Johnson had engaged in disorderly conduct, would not be sufficient to arrest him for disorderly conduct, Officer Crone added.  *Id.* 17:17–21, 19:16-22.

In his deposition, Officer Elliot said he also never observed Johnson preach or engage in whatever activity generated the complaint that day; he did not observe Johnson obstruct the sidewalk or act as though he might assault anyone.  Elliott Dep. 10:9–19.  Officer Elliot testified that, when he said raising one's voice could be a breach of the peace during the conversation with Johnson, he was "just reiterating" Officer Crone's statements; Officer Elliott said he was referring to "yelling, screaming, stuff like that."  *Id.* 6:5–21.  Officer Elliott said that, based on his training, he believed profanity could constitute disorderly conduct "along with several other factors."  *Id.* 7:12–17.  While disorderly conduct cases are necessarily complaint-driven, Officer Elliott said, he would never arrest a person simply on the basis of a complaint that someone did not like what that person said.  *Id.* 8:5–20.  Further, he characterized his statement that the

"United States of America's 'bout to put your ass in jail" as "completely off the cuff" and said it was not intended as an actual threat of arrest. *Id.* 9:2–13.

Johnson testified at the March 5, 2013 hearing that he felt threatened with arrest by police on both June 11, 2011, and April 26, 2012, and had refrained from preaching again out of fear of arrest. *Id.* 38:17–23. In comparison with June 11, 2011, when the Officers "did tell me that if I got back up there and preached, they would arrest me," on April 26, 2011, Johnson said, the threat was "hypothetical . . . I mean, I guess they said they wouldn't do it that day . . . ." *Id.* 39:24–40:6.

At the close of the March 5, 2013 hearing, the Court denied Johnson's request for a TRO and preliminary injunction preventing the City of Rock Island from enforcing the Disorderly Conduct Statute against him. *Id.* 64:1–69:18. On May 13, 2013, Johnson filed his first amended complaint, still seeking injunctive, declaratory, and monetary relief, and this time naming Officers Cary, Kuhlman, Crone, and Elliott in addition to the City. Am. Compl., ECF No. 58. The parties engaged in discovery throughout the summer and fall of 2013. In June 2013, Johnson's father was having open heart surgery, and Johnson returned to the Rock Island area. Johnson Dep. 12:1–4. Johnson preached in downtown Rock Island during the week of June 21 to 26, 2013. *Id.* 11:19–25. He said he was across the street from where he preached on April 26, 2012, and encountered about 20 people as he preached, again, during the lunchtime hour. *Id.* 19:5–20:2. Johnson did not encounter any police on that occasion. Defs.' Mem. in Supp. Mot. Summ. J. 9; Pl.'s Resp. to Mot. Summ. J. 8–9.

On January 10, 2014, Johnson filed a second amended complaint. It requests injunctive, declaratory, and monetary relief based on the following claims: (1) the Officers on both

occasions unconstitutionally applied the Illinois Disorderly Conduct Statute to curtail his preaching in violation of the First, Fourth, and Fourteenth Amendments; (2) the Officers retaliated against Johnson for exercising his First Amendment rights; (3) Defendants' conduct also violated the Illinois Constitution's Freedom of Speech and Religion clauses; and (4) the City is liable for the alleged constitutional violations based on a failure to adequately train the Officers and is obligated under Illinois statute to indemnify the Officers.  Second Am. Compl. ¶¶ 29–64.

On January 31, 2014, Defendants moved for summary judgment on all counts, arguing: (1) Johnson cannot establish an unconstitutional policy or custom necessary to support municipal liability under 42 U.S.C. § 1983, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); (2) Defendant Officers are entitled to qualified immunity; (3) Johnson lacks standing to sue in federal court; (4) Johnson has suffered no injury; (5) Johnson cannot establish elements of his First Amendment retaliation claim; and (6) Johnson is barred from seeking relief under the Illinois Constitution because state common law or federal law provides him an adequate remedy. *See, e.g.*, Defs.' Mot. Summ. J. 2–4.  The Court must examine standing first, *see Hinrichs v. Speaker of House of Representatives of Ind. Gen. Assembly*, 506 F.3d 584, 590 (7th Cir. 2007), and because Johnson fails to establish his standing to sue in federal court, the Court does not reach Defendants' other arguments.

## DISCUSSION

Johnson maintains that, despite his First Amendment right to preach, Defendant Officers threatened him with arrest and thereby chilled his exercise of his rights. This constitutes an injury

sufficient to support standing to sue in a federal court, he argues.[4]  Pl.'s Resp. to Mot. Summ. J.

30–31.  Johnson does not dispute the Illinois Disorderly Conduct Statute's facial validity, but

maintains only that the Officers unconstitutionally applied it to his preaching in Rock Island.  *See*

Second Am. Compl. ¶¶ 28–29, 38–39.

## A. Legal Framework

### 1. Article III Standing

The doctrine of standing flows from Article III's limitation of federal judicial power to

"cases" and "controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984) (citing U.S. Const., art.

III, § 2, cl. 1).   A plaintiff has standing to bring a claim in federal court only if the plaintiff

demonstrates that he or she suffered an injury in fact caused by the defendants' actions, and the

remedy the plaintiff seeks is likely to redress the injury.  *Bell v. Keating*, 697 F.3d 445, 451 (7th

Cir. 2012) (citing *Allen*, 468 U.S. at 751).  A plaintiff has the burden of demonstrating that he has

standing for each separate form of relief sought.  *See Summers v. Earth Island Inst.*, 555 U.S.

488, 493 (2009).  To carry this burden a plaintiff must provide "competent proof" in support of

the allegations, meaning that the plaintiff must show "by a preponderance of the evidence, or

proof to a reasonable probability, that standing exists."  *Zamecnik v. Indian Prairie Sch. Dist. No.

207 Bd. of Educ.*, No. 07-cv-1586, 2009 WL 805654, at *1 (N.D. Ill. 2009) (quoting *Retired Chi.

---

[4] In his Second Amended Complaint, Johnson alleged that the officers caused the following injuries: (1) deprivation of "his ability to reach his intended audience with his literature and demonstration"; (2) seizure without probable cause, and (3) chilled First Amendment rights.  Second Am. Compl. ¶¶ 38, 49.  However, Johnson does not mention the first two theories in his argument for standing, *see* Pl.'s Resp. to Mot. Summ. J. 3–35, and fails to point to facts in the record to support these allegations and refute Defendants' arguments that no such injuries occurred.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (stating that, on summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleading;" its response "must set forth specific facts showing that there is a genuine issue for trial").  Accordingly, the Court need not address these other claimed injuries.

*Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)) (internal citations omitted). A court is "free to weigh the evidence to determine whether jurisdiction has been established." *Id.* (quoting *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7 th Cir. 2012)).

When seeking prospective relief, a plaintiff need not risk arrest or prosecution in order to establish injury in fact to bring a constitutional challenge. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 591 (2012). However, the plaintiff "must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct'" and "'the injury or threat of injury is both real and immediate, not conjectural or hypothetical.'" *Bell*, 697 F.3d at 451 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). In this context, a plaintiff has standing if there is a "reasonable probability" she will suffer injury absent the requested relief. *Hoover v. Wagner*, 47 F.3d 845, 847 (7th Cir. 1995).

An injury is often found in pre-enforcement challenges to speech restrictions, because the chilling of protected speech—that is, self-censorship based on fear of legal consequences—is "a distinct harm that can be realized even without an actual prosecution." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473–74 (7th Cir. 2012) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (internal quotation marks omitted)). Chilled speech alone may constitute an injury in fact provided that the plaintiff alleges "an actual and well-founded fear" that the law will be enforced against him. *Id.* at 474 (quoting *Am. Booksellers Ass'n*, 484 U.S. at 393).

The Seventh Circuit distinguishes the claim that a statute itself criminalizes the plaintiff's conduct from a claim that a statute's misapplication unlawfully penalizes the plaintiff. *Bell*, 697

F.3d at 451. With the former, the statute's mere existence implies the government's commitment to enforce it; therefore, a plaintiff's "credible threat" to violate the statute generally creates an immediate risk of injury, conferring standing. *Id.* (citations omitted).

Where the plaintiff seeks prospective relief from the defendant's unconstitutional or erroneous application of the statute, however, the claimed injury "typically proves too remote or attenuated" to confer standing. *Id.* The general rule is that a plaintiff lacks standing to bring a pre-enforcement challenge if the plaintiff's "conduct was clearly outside the statute's scope." *Schirmer v. Nagode*, 621 F.3d 581, 586–87 (7th Cir. 2010) (quoting *Lawson v. Hill*, 368 F.3d 955, 957 (7th Cir. 2004)). While individuals may be prosecuted for conduct clearly not covered by a statute, "such remote fear does not justify an injunction absent something more than a 'nontrivial probability of prosecution.'" *Id.* (quoting Lawson, 368 F.3d at 958); *see, e.g., Lyons*, 461 U.S. at 105–06 (finding no standing where plaintiff sought to enjoin police after suffering a chokehold during a traffic stop, because he did not allege that all city officers always applied chokeholds or city protocol mandated chokeholds). Under this standard, even previous prosecution for a violating a law does not by itself establish standing to challenge its potential future enforcement. *See Schirmer*, 621 F.3d at 585.

The *Schirmer* plaintiffs were arrested under a municipal failure-to-disperse ordinance, predicated on disorderly conduct by three or more people, despite a lack of evidence that their conduct was disorderly. *Id.* at 583. The *Schirmer* Court denied the plaintiffs standing to seek an injunction against future arrest because the ordinance could not "fairly be read to prohibit peaceful protests of the sort engaged in by the plaintiffs." *Id.* at 587. *Schirmer* reasoned that the

peaceful conduct at issue there was "much different" from the violent and police-defying conduct courts have previously held to fall within the ordinance's scope. *See id.*

The Seventh Circuit noted in *Schirmer* that this rule does not extend to situations where police misuse of a statute "has become so common as to amount to a municipal policy or custom" that would subject a municipality to direct liability under 42 U.S.C. § 1983. *See Schirmer*, 621 F.3d at 587 n.1 (citing *Monell*, 436 U.S. at 694)). A persistent pattern of similar police misconduct may support standing to seek injunctive relief. *Id.* at 587. However, "'[i]solated instances of police misconduct under valid statutes would not, of course, be cause for exercise of a federal court's equitable powers.'" *Id.* (quoting *Allee v. Medrano*, 460 U.S. 802, 815 (1974)).

## 2. Municipal Liability Under 42 U.S.C. § 1983

A municipality may be held liable under 42 U.S.C. § 1983 for a constitutional deprivation resulting from a municipal policy, custom, or practice. *Waters v. City of Chicago*, 580 U.S. 575, 580 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 694). A plaintiff may establish municipal liability by showing: (1) an express policy causes a constitutional violation when enforced; (2) a widespread practice is "so permanent and well-settled" that it rises to the level of a custom or policy; or (3) the constitutional violation was caused by a person with final policymaking authority. *Waters*, 580 F.3d at 581 (citation omitted). Under certain circumstances, a municipality's failure to train its employees also rises to the level of a policy or custom sufficient to support municipal liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

A municipality is liable under *Monell* when a failure to train police officers amounts to "deliberate indifference" to the rights of private individuals with whom the police interact. *City*

*of Canton*, 489 U.S. at 388. This standard is met in either of two scenarios: (1) "'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' that the deficiency exhibits a deliberate indifference on the part of municipal policymakers;" and (2) "when a repeated pattern of constitutional violations makes 'the need for further training . . . plainly obvious to the city policymakers.'" *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *City of Canton*, 489 U.S. at 390 & n.10).

### 3. Illinois Disorderly Conduct Statute

Illinois law prohibits disorderly conduct, defined as knowingly performing "any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1). The provision "is intended to guard against 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.'" *Stokes v. Bd. of Educ. of the City of Chicago,* 599 F.3d 617, 622 (7th Cir. 2010) (quoting *People v. Davis*, 413 N.E.2d 413, 415 (Ill. 1980)). The statute is not unconstitutionally overbroad or void for vagueness, and is valid even if "it may possibly be misapplied to include [constitutionally] protected activity." *United States v. Woodward*, 376 F.2d 136, 140–43 (7th Cir. 1967).

Whether conduct is unreasonable under 720 ILCS 5/26-1(a)(1) depends on the facts and circumstances of each case. *Stokes*, 599 F.3d at 622 (citing *People v. Queen*, 859 N.E.2d 1077, 1085 (Ill. App. Ct. 2006)). The conduct at issue "must actually bring about a breach of the peace, not merely tend to do so." *Id.* (citing *In re D.W.*, 502 N.E.2d 419, 421 (Ill. App. Ct. 1986)) (finding breach-of-peace element met where complainant witnessed three women "tangled

together in a violent exchange"). The Seventh Circuit has endorsed the Restatement's definition of breach of the peace: "a public offense done by violence, or one causing or likely to cause an immediate disturbance of the public order." *Sroga v. Weiden*, 649 F.3d 604, 607 (7th Cir. 2011) (citing Restatement (Second) of Torts § 116 (1965)). Blocking the free flow of pedestrian traffic also constitutes disorderly conduct under Illinois law. *Marcavage v. City of Chicago*, 659 F.3d 626, 632 (7th Cir. 2011) (upholding disorderly conduct arrest where preaching plaintiff blocked a pedestrian walkway and defied police requests to move from his position on a crowded street corner).

Where words alone form the basis for a disorderly conduct charge, they must be "fighting words" and contain an implied or explicit threat of violence. *People v. Mathers*, No. 3-09-0510, 2011 WL 10457960, at *3 (Ill. App. Ct. Feb. 15, 2011); *People v. Redwood*, 780 N.E.2d 760, 763 (Ill. App. Ct. 2002); *see, e.g., Gower v. Vercler*, 377 F.3d 671, 669 (7th Cir. 2004) (upholding finding that probable cause existed to arrest plaintiff for disorderly conduct where plaintiff shouted personally abusive obscenities and "attempted to provoke a violent reaction by figuratively insulting [a victim's] courage"); *Zoril v. Cross*, No. 09 C 2624, 2010 WL 2836636, at *2 (N.D. Ill. July 8, 2010) (finding no disorderly conduct where plaintiff used racial slurs during 911 call and shouted at police, because no breach of peace was incited). Fighting words are "personally abusive epithets which, when addressed to an ordinary citizen, as a matter of common knowledge, are inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20 (1971). "'It remains no crime to express an unpopular view even if the person expressing those views draws attention to herself or himself or annoys others nearby.'" *Thayer v. Chiczewski*, 705 F.3d 237, 248 (7th Cir. 2012) (quoting *People v. Rokicki*, 718 N.E.2d 333, 339

(Ill. App. Ct. 1999)).

"Loud and raucous noises" traditionally fall within the common-law definition of disorderly conduct, but neither volume level nor type of sound are singly determinative. *City of Chicago v. Wender*, 262 N.E.2d 470, 472 (Ill. 1970). Thus, courts have found that loud noise amounts to disorderly conduct (1) when it occurs in the middle of the night in a residential neighborhood, *People v. Albert*, 611 N.E.2d 567, 569 (Ill. App. Ct. 1993) (upholding disorderly conduct conviction where defendant "shouted loudly and for several minutes in a residential neighborhood" at about 2 a.m. on a workday), (2) when it is amplified, *Vill. of Monee v. Thompson*, No. 3-12-0494, 2013 WL 3779896, at *4 (Ill. App. Ct. July 15, 2013) (upholding disorderly conduct conviction under village ordinance where defendant employed four 4-foot speakers during backyard party loud enough to vibrate neighbor's windows), or (3) when it is "raucous" and accompanied by "boisterous, drunken behavior," *Webb v. Lanton*, No. 08 C 6603, 2010 WL 2102416, at *4 (N.D. Ill. May 18, 2010) (finding police had probable cause to arrest Webb for disorderly conduct where he, apparently intoxicated, yelled profanity at passing vehicles at 9 p.m., "when citizens in the neighborhood could reasonably expect peace and quiet," and disobeyed traffic signals).

### B. Analysis

#### 1. Prospective Relief

At the threshold, the Court must determine whether Johnson seeks prospective relief to protect conduct that actually violates the Illinois Disorderly Conduct Statute, or that would only violate the statute if misapplied by Rock Island police officers. *Bell*, 697 F.3d at 451. The Court finds the latter, because the evidence shows that Johnson's conduct falls "clearly outside the

statute's scope." *See Schirmer*, 621 F.3d at 586–87. As a result, to establish standing to seek prospective relief, Johnson must show that more than a "nontrivial probability of prosecution" underlies his claimed injury of chilled speech. *See id.* As explained below, this he fails to do.

## A. Conduct Falls Outside Scope of Statute

Johnson's preaching is "much different" from the behavior courts have held to constitute disorderly conduct. *See id.* at 587. Not a single allegedly disruptive aspect of Johnson's behavior comes close to that exhibited in prior cases.

Johnson testified that he spoke in loud voice—on a public street in a commercial district during the day—to project his message to passersby often located across the street, but did not shout, scream, or employ artificial amplification. Defendants did not receive reports that contradicted that testimony. Johnson's speech therefore differs in kind from the late-night shouting or yelling in a residential area or artificial amplification that characterizes disorderly conduct based on "loud and raucous" noise. *See Albert*, 611 N.E.2d at 569; *Thompson*, 2013 WL 3779896, at *4; *Webb*, 2010 WL 2102416, at *4. Further, the Officers did not testify to any reports that Johnson blocked traffic, Defs.' Reply 5, ECF No. 85, and no evidence shows that Johnson typically did so. *See Marcavage*, 659 F.3d at 632. The absence of amplification or traffic obstruction clearly distinguishes Johnson from street preachers who engaged in disorderly conduct. *See id.*; *Teesdale v. City of Chicago*, 792 F. Supp. 2d 978, 991 (N.D. Ill. 2011), *rev'd on other grounds*, 690 F.3d 829 (7th Cir. 2012) (finding police had probable cause to arrest street preacher for disorderly conduct where preacher's use of bullhorn disturbed many festival participants and preacher refused festival security's request to stop). No precedent suggests a person may not speak loudly in a commercial district during daytime.

Any disorderly conduct charge against Johnson would thus rest on the content of his speech. However, no evidence suggests Johnson uses "personally abusive epithets" or that his religious message is "inherently likely to provoke violent reaction." *See Cohen*, 403 U.S. at 20. On both occasions, the Officers claimed to receive reports that Johnson was "cussing" and scaring people. The evidence shows that the "cussing" at issue is Johnson's use of the term, "Hell." The evidence suggests, however, that Johnson does not use the term in a profane manner—as an expletive or epithet, for example—but rather to invoke the Christian theological concept of Hell.

As for alarming his audience, Johnson acknowledges that reminding people that they will die is part of his message. However, it is undisputed that in telling his audience they will die, Johnson speaks theoretically, and is not threatening to bring about any person's death himself. *See, e.g.,* Defs.' Reply 11 (conceding, regarding the April 26, 2012 incident, that Johnson did not "threaten any bodily harm toward anyone"). While sermons on death and judgment may discomfort some individuals, such talk cannot reasonably be perceived as "personally abusive." *See Cohen*, 403 U.S. at 20.

The requisite "fighting words" are thus absent from Johnson's preaching. *See Mathers*, 2011 WL 10457960, at *3. Moreover, no party claims Johnson has ever sparked violence or public unrest. *See Sroga*, 649 F.3d at 607. There is no reasonable way to perceive Johnson's self-described activity as generating a breach of the peace, and there is no evidence that police received any complaints of activity amounting to a breach of the peace in Johnson's three Rock Island preaching episodes. Absent this essential element of the disorderly conduct offense, *see Stokes*, 599 F.3d at 622, Johnson's conduct would only fall under the statute through its gross

23

misapplication.  *See Schirmer*, 621 F.3d at 587.  Indeed, Officers Cary, Crone, and Elliott testified that Johnson's reported conduct on the dates at issue did not provide them with sufficient grounds to arrest him for disorderly conduct.[5]  In sum, it would require a clear misapplication of the Disorderly Conduct Statute to arrest Johnson under it.

### b. Failure to Show Sufficient Likelihood of Injury

Since he therefore seeks injunctive relief against a statute's erroneous or unconstitutional application, Johnson must clear a high bar in showing that his injury is not "too remote or attenuated" to confer standing.  *See Bell*, 697 F.3d at 451.  Johnson essentially claims the statements of the Rock Island officers on June 11, 2011, and April 26, 2012, establish that he faces more than a "nontrivial probability" of injury through police enforcement of the Disorderly Conduct Statute.  *See Schirmer*, 621 F.3d at 587.  However, those discussions primarily consisted of the police (1) informing Johnson they had received complaints from people disturbed by his preaching, and (2) discussing hypothetical situations involving activities that could violate the Disorderly Conduct Statute.  On neither day did the Officers actually arrest Johnson, indicate that they could arrest him for his activities on that particular day but were letting him off with a warning, or vow to arrest him should he ever preach there again.

Regarding June 11, 2011, Johnson testified that Officer Cary told him he may not raise his voice, "say anything that could offend anyone," and "say anything that would disturb anybody in any way," on penalty of arrest.  Officer Cary testified that he gave Johnson "the guidelines of

---

[5] In moving for summary judgment, Defendants expressly acknowledge this point: "There are no facts to suggest that Johnson's preaching on those days fell within the realm of disorderly conduct.  In fact, the only reason the statute has even come into play in this litigation is because of the role it played in conversations regarding hypothetical, as opposed to actual, behavior."  Defs.' Mem. Supp. Mot. J. 25.

disorderly conduct," and told Johnson he could continue preaching but said Johnson could not block pedestrian traffic or "get in their face and yell and scream to the point that it would alarm or disturb them." The interpretation Johnson attributes to Officer Cary would be a clear misapplication of the statute, while Officer Cary's account appears to incorporate the requisite "fighting words" element, *see Mathers*, 2011 WL 10457960, at *3, thus properly interpreting the statute and excluding its application to Johnson's preaching.

Johnson claims his conversation with Officers Crone and Elliot on April 26, 2012, also represented a concrete threat of arrest, particularly Officer Elliott's statement, "The United States of America's 'bout to put your ass in jail." This flippant remark was made as the Officers were leaving, after they had already indicated that they were not arresting Johnson and that they were not going to continue the conversation in light of Johnson's revelation of his ongoing suit against Rock Island. The Officers' actions thus belied any intent to arrest that could be construed from Officer Elliot's remark. However, Office Elliott did tell Johnson he could be arrested for conduct that Johnson arguably engages in when preaching. Officer Elliott said, "You cannot raise your voice, you cannot be loud, you can't sit there and cuss, you can't sit there and tell people they're going to die." Similarly, Officer Crone told Johnson that he "can't curse and scare people." The definitions of disorderly conduct seemingly espoused by Officers Crone and Elliott and attributed by Johnson to Officer Cary are misinterpretations of the statute, as explained above. But, if even a past prosecution under a statute does not establish standing to seek prospective relief against its future erroneous application, *see Schirmer*, 621 F.3d at 585, then police officers' erroneous description of the elements of an offense in a theoretical conversation on, at most, two occasions, with no ensuing arrest or prosecution, is also insufficient.

Johnson may face more than a "trivial probability" of arrest if the Officers' statements are evidence of a common practice of misapplying the Disorderly Conduct Statute that rises to the level of a Rock Island Police Department custom or policy. *See Schirmer*, 621 F.3d at 587 n.1. Johnson argues that Rock Island maintains such an unconstitutional policy or custom through its failure to adequately train its police officers to deal with First Amendment issues. Johnson supports his failure-to-train claim with the Officers' deposition testimony: Officer Elliott could not recall receiving First Amendment freedom-of-speech training, and Officers Crone and Cary could not recall whether and to what extent they may have received First Amendment training. Elliott Dep. 3:21–24; Crone Dep. 4:18–24; Cary Dep. 5:22–6:9.

In refutation, Defendants point to the Rock Island Police Department Operations Manual entry on Civil Disturbances, which, among other guidance, defines a civil disturbance as "[a]n unlawful assembly that constitutes a breach of the peace or any assembly of persons where there is imminent danger of collective violence, destruction of property or other lawful acts." R.I.P.D. Operations Manual 1, ECF No. 78-11. Defendants also cite the deposition testimony of Officer Miles, who said he received training in civil disturbances. Miles Dep. 6:25–7:2, ECF No. 78-10.

Moreover, Officer Cary testified that he has never arrested anyone under the Disorderly Conduct Statute for merely speaking in public; his arrests have been for "yelling, screaming, out of control behavior" that was "leading toward violence." Cary Dep. 8:21–9:16. Officer Crone testified to his understanding that the alarm or disturbance necessary for disorderly conduct only happens where the actor's "physical actions are becoming assaultive." *See* Crone Dep. 13:11. Officer Elliott testified that loud speech was disorderly when it rose to the level of yelling and screaming, and profanity could support a statutory violation only when considered as one of

several factors.  *See* Elliott Dep. 6:5–21; 7:12–17.  This unrefuted testimony illustrates each

Officers' familiarity with the circumstances necessary to support a valid arrest under the

Disorderly Conduct Statute, which has been upheld against First Amendment attack.[6]  *See*

*Woodward*, 376 F.2d at 140–43.

Additionally, Johnson does not make the requisite showing of deliberate indifference by

City policymakers.  *Jenkins*, 487 F.3d at 492.  He points to no evidence showing that the alleged

absence of First Amendment training was "so obvious" as to "likely to result in the violation of

constitutional rights."  *Id.*  Johnson also fails to identify any relevant constitutional violations by

Rock Island police that would constitute a "repeated pattern" to place the City on notice of

deficiency in its training.  *See id.*  Even if the Court were to find that the theoretical statements by

the Officers did in fact constitute concrete threats of arrest under a mistaken reading of the

Disorderly Conduct Statute, Johnson fails to show these statutory misinterpretations were

anything more than "'[i]solated instances of police misconduct under valid statutes.'" *See*

*Schirmer,* 621 F.3d at 587 (quoting *Allee*, 460 U.S. at 815).

In sum, Johnson has not established by a preponderance of the evidence that he faces a

real and immediate threat of injury. *See Retired Chi. Police Ass'n*, 76 F.3d at 862; *Bell*, 697 F.3d

at 451.  Without any measurable likelihood of arrest on the horizon, Johnson is essentially asking

the Court to render an advisory opinion as to whether his preaching is constitutionally protected

against prosecution as disorderly conduct.  This the Court may not do.  *See FCC v. Pacifica*

*Found.*, 438 U.S. 726, 735 (1978) ("[F]ederal courts have never been empowered to issue

---

[6] Indeed, Johnson acknowledges that the Officers' experience with actually arresting someone under the statute "involved persons yelling and screaming, and engaged in conduct not witnessed from Plaintiff." Pl.'s Resp. to Mot. Summ. J. 14.

advisory opinions.")  Johnson therefore lacks standing to bring a pre-enforcement claim for

injunctive and declaratory[7] relief.

### 2. Retrospective Relief

Johnson also seeks monetary relief under 42 U.S.C. § 1983 based on the Officers' alleged

threats of arrest, which he claims had a chilling effect on his preaching.  While chilled First

Amendment rights can constitute an injury in fact, they do not here, as Johnson has failed to

show he had an "actual and well-founded" fear that the Disorderly Conduct Statute would be

enforced against him.  *See Ctr. for Individual Freedom*, 697 F.3d at 474.

As for his "actual," or subjective fear, Johnson claims the alleged arrest threats deterred

him from continuing to preach on the days in question.  However, he acknowledges that he had at

least temporarily ceased preaching on June 11, 2011, and was actually leaving for the day on

April 26, 2012, when his encounters with police occurred.  His testimony that he may have

resumed preaching on June 11, 2011, but for his interaction with the Officers is merely

conjectural.  *See Bell*, 697 F.3d at 451.  Johnson also testified that the perceived threats of arrest

caused him to generally forego preaching in Rock Island.  However, the credibility of this

statement is undermined by Johnson's actions: he preached again at least two times following the

first claimed threat of arrest, and absent any court protection.   The weight of the evidence shows

Johnson had, at best, slight and inconsistent "actual" fear of enforcement.

As for a "well-founded," or objective fear, the Court has explained at length the absence

---

[7] Federal declaratory relief is available in "a case of actual controversy,"  28 U.S.C. § 2201, which "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III," *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).  The DJA does not supplement federal jurisdiction—an Article III justiciable controversy between adverse parties must still exist.  *A.G. Edwards & Sons, Inc. v. Public Bldg. Comm'n of St. Clair Cnty., Ill.*, 921 F.2d 118, 120 n.2 (7th Cir. 1990) Therefore, Johnson's lack of standing to seek a pre-enforcement injunction means he also lacks standing to seek declaratory relief.

of any measurable likelihood that Rock Island police officers would enforce the Disorderly

Conduct Statute in light of his reported activity.  Additionally, it bears emphasizing that Johnson

preached at least three times in downtown Rock Island, police investigated him on two of those

occasions, and not once was Johnson been arrested.   In light of these circumstances, Johnson did

not have an objectively reasonable, "well-founded," basis to anticipate arrest.  *See Ctr. for*

*Individual Freedom*, 697 F.3d at 474.  In the absence of both an "actual" and a "well-founded"

fear of enforcement, Johnson does not have standing to seek retrospective relief on the basis of

chilled First Amendment activity.

As noted, it is unclear whether Johnson argues that he suffered additional injuries flowing

from the claimed arrest threats, such as unlawful seizure.  However, even if a threat of arrest may

in some circumstances constitute a seizure, *see, e.g., Kernats v. O'Sullivan*, 35 F.3d 1171, 1181

(7th Cir. 1994) (noting legal uncertainty as to whether command coupled with threat of arrest

constitutes a seizure), Johnson has forfeited any claim to standing on the basis of an injury of

unlawful seizure by (1) failing to defend it in response to Defendants' motion for summary

judgment, and (2) failing to support this theory with evidence.  *See* Pl.'s Resp. to Mot. Summ. J.

30–35.

Finally, if Johnson argues the alleged arrest threats injured him other than through a

chilling effect or unconstitutional seizure, he fails to show evidence of that injury.  In general, the

mere threat of arrest does not violate constitutional rights.  *See, e.g., Dick v. Gainer*, 1998 WL

214703, at *5 (N.D. Ill. Apr. 23, 1998) ("There is no constitutional right to be free from threats

of arrest; an actual civil rights violation must occur before a cause of action arises under

§ 1983."); *Arnold v. Truemper*, 833 F. Supp. 678, 682 (N.D. Ill. 1993) ("[P]olice harassment,

without more, cannot form a basis for a § 1983 cause of action.").  In the absence of "competent proof" that the Officers' statements, even interpreted as threats of arrest, actually interfered with Johnson's preaching, chilled his willingness to preach in Rock Island again, or violated other of his rights, Johnson has not established that those statements caused him a cognizable injury.  *See Retired Chi. Police Ass'n*, 76 F.3d at 862.  Johnson therefore lacks standing to seek monetary relief for Defendants' alleged unconstitutional application of the Illinois Disorderly Conduct Statute.

Johnson has not established the injury necessary for standing to bring his claims for either prospective or retrospective relief in federal court.  Accordingly, all of Johnson's claims are dismissed.

## CONCLUSION

Plaintiff's Motion to Supplement his Response to Motion for Summary Judgment, ECF No. 86, is GRANTED.  Plaintiff's Motion to Consider the Evidence Tendered in Open Court, ECF No. 87, is MOOT.  Plaintiff's Motion to Strike Reply to Response to Motion for Summary Judgment, ECF No. 88, is DENIED.  Defendants' Motion for Summary Judgment, ECF No. 78, is GRANTED.  All counts in the Second Amended Complaint, ECF No. 75, are DISMISSED because Johnson lacks standing to assert his claims in federal court.  The Clerk is directed to enter judgment, closing the case.


Entered this 11th day of September, 2014.

_____
s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE